[Crim. No. 3666.   Second Dist., Div. Two.   Mar. 29, 1943.]

THE PEOPLE, Respondent, v. WARREN HERSHEL MUMMERT et al., Appellants.

Gladys Towles Root and Eugene V. McPherson for Appellants.

Robert W. Kenny, Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Respondent.

MOORE, P. J.—Appellants were jointly and severally accused by amended information in four counts of rape on the same woman, on the same night. Each count charges a separate crime by the four men in that as each raped the prosecutrix the other three aided and abetted him; that each defendant accomplished his act without the consent of the young lady; that she resisted, but that her resistance was overcome by force and violence used upon her by defendants. Defendant Wayman Mummert is alleged to have suffered a previous conviction of possessing an illicit still. Since no point is made of that bit of personal history no further mention will be made of it. After conviction by a jury as charged and their motion for a new trial having been denied, they were sentenced to the state prison for the term prescribed by law ''as to each count.'' They appeal from the order denying such motion and from the judgments rendered.

Three grounds of appeal are presented: (1) the judgments are contrary to the law and the evidence; (2) the court's refusal to limit the jury's consideration to subdivision 3 of section 261, Penal Code; (3) refusal of some and modification of others of certain instructions proposed by appellants and in misdirecting the jury by the instructions proposed by the People.

(1) The facts impliedly found by the jury established that the victim, a single girl, five feet three inches tall, weighing 138 pounds, was twenty years of age. Having hailed from Minnesota, she had lived at San Fernando five months prior to the trial. She there gained her livelihood by serving as a waitress. On the evening of her unfortunate experience she undertook to ''hitch-hike'' to Newhall, some

ten miles north of her home. About 8 p.m., on Highway 99, north of San Fernando, on her signal for a ride the two-door sedan of defendants stopped and George Mummert alighted and invited the young woman to enter. She occupied the front seat between George and his brother Warren. They told her they were going to Newhall, whither she was bound to visit her brother who was there on furlough from Pearl Harbor. As they proceeded Wayman and defendant Lockhart occupied the rear seat. George and the two men in the rear seat were drinking liquor. Little was said during the time required to reach the turnoff leading to Mojave and away from Newhall. On observing that the car had taken a direction away from the road leading to her destination the girl asked permission to leave, but instead the automobile continued on its northerly course to a section strange to the wayfarer. She repeated her request to be allowed to leave, to which Warren replied that he wished to go down a couple of miles for a drink. When later, about 8:30 o'clock, they stopped on the side of the highway she and the Mummert brothers alighted and the girl attempted to run towards a car then about one-half mile distant, approaching from the north. When she had run about three yards one of the men grabbed her and threw her into the back seat beside Lockhart, who took hold of her shoulders. She attempted to kick Wayman Mummert, who held her by the feet, and struggled, twisted and kicked to regain her freedom, all the time swearing at Wayman. In the course of her struggles, George shook his clenched fist at her and told her to ''shut up''—that he did not ''want to be caught with any screaming woman.'' Wayman removed to the front seat, whereupon Lockhart directed some honeyed words to the girl and assured her that he was unmarried; that if she would submit to him he would forbid his companions to molest her and would buy her a ticket to Newhall on the next day. She rejected every proposition advanced and refused liquor offered her. At about 9 o'clock, at a point about 17 miles south of Palmdale, the car turned off the highway a half mile into the desert where there was no living thing but cactus, stunted shrubs and denizens of the desert. All parties left the automobile for a moment, whereupon while the others were ten feet away Wayman returned, ordered the girl to re-enter the car and shoved her into the back seat with threats that he did not want to

"fool around" with her. Upon her failure to remove her slacks he declared he would rip them off and would leave her in the desert with a broken body. Following her steadfast refusal to comply, while she was still sitting Wayman removed her slacks and shorts from her body, pulled her down and effected an act of sexual intercourse. She made no further resistance because of her fear that if she did so the men would perpetrate their atrocities, beat her and leave her there.

While Wayman enacted the scene above described his confederates continued to stand behind a bush ten feet away. Upon his leaving the automobile Lockhart entered immediately and ravished the girl. He was followed by George Mummert, who accomplished the same act. Following Lockhart's repetition of his crime, Warren Mummert followed the example of his companions and violated the girl as the car proceeded to Lancaster. The party arrived there about midnight. To none of the assaults made upon the girl did she make resistance because of the shock she suffered by the kidnapping and the violence of the initial assault upon her and her fear that the men would carry out their threats to kill or bruise her and leave her alone in the open space.

During the abuse of complainant the party traveled through an interminable silent waste with but few human habitations along the way, the girl always begging to be released. They passed through Palmdale without stopping. When they reached Lancaster she resorted to strategy to regain her liberty. After one of the men ordered that she be taken outside of town she persuaded them to allow her to dress in order to move to the front seat. On stepping out as if to enter the front seat she ran across the street to a cafe. There in an hysterical, weeping, nervous state she entered the restroom where she was found by the Eliopulos sisters, whose sympathies were aroused by the nervous and disheveled condition of the stranger and the bloodstains on her clothing. To them she related her experiences and they in turn led her to the substation of the sheriff's office. After reciting the facts to the deputy in charge the arrests of appellants followed. Each man was brought in alone to confront her. Each denied ever having seen the girl before. Each had bloodstains on the front of his clothing near the fly of the trousers; each denied knowledge of the origin of

such stains. Chemical analyses of smears were taken from the young woman by a physician at Lancaster, who applied it to a slide and delivered it to deputy sheriff Campbell. This deputy took the shorts and overalls worn by Warren Mummert, the coat, shorts and trousers worn by Lockhart, the blue overalls from Wayman Mummert, the shorts of Wayman and George and a blanket and handkerchief found in the automobile nine miles north of Lancaster, and delivered them to Deputy Atherton, the forensic chemist of the sheriff's office. Also they found a hair-ribbon of complainant with the other items in the sedan. To the deputy sheriff each prisoner, separately and out of hearing of the others, denied knowledge of the origin of the bloodstains and each denied intercourse with complainant. In their presence she stated that she feared the men because one of them had struck her, one had threatened to hurt her and one had threatened to leave her on the desert. To her statement they declined to make response.

Atherton is a forensic chemist with the Bureau of Identification. He received the slide from Deputy Campbell April 30th and found on it bloodcells, epithelial cells and spermatazoa. He found it was human blood belonging to the same group as that taken from complainant's finger. He found by chemical tests that the various articles of clothing taken off the prisoners, and the kerchief and blanket taken from the sedan, were stained with seminal fluid, and that the blood in every instance but one was demonstrated to be that of the prosecutrix.

Appellants contend that there is an utter lack of evidence that they aided or abetted one another in the commission of the crimes; that after the girl had been thrown into the car no rape occurred until they had driven some distance; that at the time of each rape the unoccupied three stood some distance, except in the case of Warren. During the act of that defendant the car was speeding at forty-five miles per hour. But when the criminal acts of the first three occurred the requests of the girl to be allowed to leave the car had been ignored, after she had been grabbed, following her attempt to run, and violently pushed into the car and threats had been made with clenched fists to "shut up." Immediately after her first break for liberty had been frustrated, demand was made by Lockhart that if she submit to

his desires he would protect her from the others. After she had rejected all of his proposals the car came to a stop about 9 p.m. in the desert, a half mile off the highway. There, with his three companions close by, Wayman ordered her to disrobe. His act in forcing her into the rear seat, in removing her clothing as she resisted and his aggressive action in assaulting her with the manifest approval of his companions, was sufficient violence to overcome her resistance.

The contention that the girl made no attempt to induce the three disengaged men to beat off her present assailant and that she made no outcry as they successively raped her is an idle mockery. From the first exhibition of a criminal intent toward her they had demonstrated perfect harmony and fraternal cooperation among themselves. For any man to stand by serenely and sympathetically in the presence of an act of rape by his associate is itself proof of his approval of and cooperation with the criminal act. That she should in her anguish make an outcry to such associates and thereby attempt to gain their protection is not necessary to render them guilty of aiding and abetting the criminal. They aided and abetted by their actual presence, and by their acts they rendered actual assistance to the perpetrator. (*Lassen* v. *Board of Dental Examiners*, 24 Cal.App. 767, 772 [142 P. 505].) At the time of the rape by each of the men the other three stood near by and abetted the perpetrator by presenting a show of force and by keeping watch against intrusion. As each without resentment toward his acting confederate and without concern for the girl permitted the outrage, they exemplified a united and single purpose which would brook no interference. Each thus encouraged and aided his several companions and was therefore a principal in each of the crimes. (*People* v. *Best*, 43 Cal.App.2d 100, 105 [110 P.2d 504].)

There is no mark of improbability in the narrative of the prosecutrix. More than three hours were consumed by appellants in traveling the fifty miles with complainant, notwithstanding a paved highway and no delays on account of motor trouble. When they arrived at Lancaster the girl was in a state of frenzy. Her hair was disheveled; her clothing was disarranged and unfastened. Her face was marked with her tears and her extreme nervousness belied the testimony of appellants that she had agreeably cooperated with each of

them. Moreover, the clothing of each of the prisoners bore stains of his own seminal fluid, confused with the very menstrual blood of his victim. Such proof, furnished by disinterested witnesses and by aid of chemistry, leaves no room for speculation. Rather does it furnish factual and scientific corroboration of the details related by the prosecutrix.

The claim that there was no threat directed toward the girl is of one with the contention that she made no complaint to the others. The voice that quieted complainant declared that her broken body would be left on the desert. What girl would not subside at such show of violence reinforced by stern vocal demands? She not only related her sufferings to the authorities but submitted to an examination by a physician. Every denunciation of the screaming woman in the car and every threat accompanied by waving a clenched fist at her was heard or seen by all four men. But even though there had been no words spoken in advancing their common purpose, the act on the part of each of the four men in moving along amidst the desert at night, in harmony with his three confederates to the accomplishment of the several depraved, criminal acts upon a girl who had pleaded for her liberty, was of itself the application of violence and rendered each of them guilty of kidnapping as well as of rape.

(2) Appellants assign as error the refusal of the court to limit the jury's consideration to subdivision 3 of section 261 of the Penal Code. That subdivision makes rape of an act of sexual intercourse where the female's resistance is overcome by force or violence. Subdivision 4 makes the act a rape if the victim's resistance is prevented by threats of great and immediate bodily harm accompanied by apparent power of execution. Because the court in its instruction included the circumstances prescribed in both subdivisions 3 and 4 in its definition of the crime, appellants contend that the accusation is drawn under subdivision 3 and that consideration should have been confined by instructions to whether her resistance was overcome by force and violence. This very contention was made in the case of *People* v. *Craig*, 17 Cal.2d 453 [110 P.2d 403], where the accused was charged in two separate counts of (1) statutory rape and (2) rape by force. Two separate judgments having been entered, they were on appeal consolidated into one judgment of conviction for rape. It was there held that the essential guilt of rape consists in

*the outrage* to the person and feelings of the victim (section 263 Penal Code) ; that she was not doubly outraged, once by force and once because of her tender years, but suffered only a single offense. The reasoning and authorities cited by the Chief Justice in the Craig decision sound a nullity for appellants' contention. The purpose of dividing section 261 into subdivisions was to put beyond doubt the rule that if the things mentioned in the subdivisions are proved they would establish the crime. (*People* v. *Snyder,* 75 Cal. 323 [17 P. 208].) It was not thereby intended to create six different kinds of crime. In drawing the amended information the pleader followed the familiar rule which requires a succinct statement of the facts to be proved. From the pleadings it is clear that it was intended to establish the crimes by proof of ''force and violence'' as the circumstances under which defendants acted in accomplishing their crimes. The evidence having disclosed that other ''circumstances'' itemized in subdivision 4 accompanied their crimes, it was not amiss for the court to include such circumstances also in its definition of rape, since the existence of all six of the ''circumstances'' would not have increased the number of the crimes. Each rape would have meant only one outrage to the victim had she been at the same time under age, of unsound mind, subjected to narcotics and unconscious of the nature of the act, as well as being the victim of force and violence.

◼ (3) Appellants claim to be aggrieved because of the refusal of the court to read a cautionary instruction offered by their counsel. They contend that whenever a party is accused of a sex crime the court should admonish the jury to scan the testimony of the prosecutrix because of the ease of accusing and the difficulty of disposing of such an accusation. It is true that the Supreme Court has declared it to be a rule that in sex cases ''the defendant should be afforded the benefit of a cautionary instruction . . . '' (*People* v. *Putnam,* 20 Cal.2d 885, 889 [129 P.2d 367] ; *People* v. *Lucas,* 16 Cal.2d 178 [105 P.2d 102, 130 A.L.R. 1485].) But it has been repeatedly held in such cases that where there is corroborative evidence it is not necessarily prejudicial error for the court to refuse a cautionary instruction. (*People* v. *Garrett,* 27 Cal.App.2d 249 [81 P.2d 241] ; *People* v. *Agullana,* 4 Cal.App.2d 34 [40 P.2d 848] ; *People* v. *Williams,* 55 Cal.App.2d 696 [131 P.2d 851].)

The practical demonstration of the fact of the sexual intercourse of appellants with the prosecutrix was made not only by the forensic chemist but also by the belated confessions of the prisoners, who at Lancaster denied they had ever seen the girl before. The age of the victim; the kidnapping of her on the highway when on her way to Newhall to visit her brother; the length of time required for them to travel the fifty miles; their drinking of liquor en route; their denials of the crimes to the officers and their protestations of never having seen the girl; the fact that the four had five acts of intercourse with her within less than three hours after meeting her—these facts rendered cautionary instructions superfluous if not detrimental to a fair presentation of the cause to the jury. In the face of the facts presented by the People it was not unfair to the prisoners to let their own accounts of the occurrences in the desert and on the Lancaster highway go to the jury without sympathetic comment from the court. No prejudice was suffered by the rejection of cautionary instructions.

The numerous other instructions proposed by appellants and rejected by the court had no place in the record. They are either repetitious or argumentative or inapplicable to the facts. Merely because threats were made by the accused in the course of perpetrating their crimes by force and violence it was not for that reason necessary to charge the jury concerning the threats. It is clear that the threats were not made for the purpose of subduing the complainant but were uttered contemporaneously with and as oral expressions of the force and violence applied. Had appellants merely threatened; had they not continued away from the Newhall highway as she pleaded for her release; had they not caught her as she ran from them toward the approaching automobile and returned her to a seat in their sedan; had Wayman not forcibly removed her undergarments after her refusal to do so, it is not certain that threats alone would have detained her.

The judgments and the order denying the motion for a new trial are affirmed.

McComb, J., concurred.

Wood (W. J.), J., concurred in the judgment.

Appellants' petition for a hearing by the Supreme Court was denied April 26, 1943.